IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL CASE  NO. H-08-105 |
| | § | |
| EVERARDO FLORES CASTANEDA | § | |
| GELBER CORNELIO PEREIRA | § | |

## <u>**MEMORANDUM AND ORDER**</u>

Defendants Everardo Flores Castaneda and Gelber Cornelio Pereira are charged with conspiracy to transport and harbor undocumented aliens within the United States in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(I), and 1324(a)(1)(B)(i).  Defendants moved to suppress certain evidence against them [Docs. # 38 and # 56], and the Government filed its Response [Doc. # 58] in opposition to Defendants' motions.[1]  The Court held an evidentiary hearing on May 1, 2008.  The Government called several witnesses:  Immigration and Customs Enforcement ("ICE") Agents Sylvia Snyder, Frank Terrazas, Christian Kaufmann, and Theodore Klein.  Defendants elected not to testify or put on any witnesses.  The Court credits the testimony of each of the Government's witnesses.

---

[1]     Defendants adopted and joined in each other's arguments, and the Government filed a consolidated response to both motions.

The Court has considered the motions, the Government's response, the evidence presented at the hearing, counsel's written and oral arguments, and the applicable legal authorities.  The Court makes the following findings of fact and conclusions of law,[2] and **denies** Defendants' motions to suppress.

I.      **FINDINGS OF FACT**

On Friday, January 4, 2008, Sylvia Snyder, an ICE agent assigned to the group responsible for conducting alien hostage investigations, received a phone call from Maria Delgado, a Colorado resident.   Ms. Delgado advised Agent Snyder that Delgado's relative, Fabiano De Silva, a Brazilian national, was being held by alien smugglers who were demanding $15,000 for his release. Ms. Delgado stated that the smugglers told her if she did not pay the $15,000 smuggling fee they would kill De Silva.  A few days later, Ms. Delgado reported to Agent Snyder that Delgado had received a phone call from the smugglers and could hear them beating De Silva. De Silva confirmed to Ms. Delgado that he had been beaten.

A few days later, Agent Snyder received a phone call from Addie Silva, a resident of Connecticut.  Ms. Silva reported during the phone call that her 17-year-old

---

[2]      The Court explains the evidence and uses various forms of the word "find" to indicate a finding of fact, and sets forth legal principles and uses forms of the words "hold" and "conclude" to indicate a conclusion of law.  To the extent a finding of fact is more properly a conclusion of law, and to the extent a conclusion of law is more properly a finding of fact, it should be so construed.

sister, Adelaine Jesus, and her 35-year-old uncle, Antonio Gonzalez, both Brazilian nationals, were being held against their will by alien smugglers who were demanding $15,000 each for their release.  Ms. Silva also reported that the smugglers demanded the money be paid and threatened to kill her sister if those demands were not met. Ms. Silva stated that she had already paid the smugglers $5,000 in Brazil, another $5,000 in Guatemala, and $10,000 thereafter in early January 2008.  Ms. Silva also advised that she had another Brazilian friend named Luis whose wife, Amanda, and 6-year-old son were also being held hostage by the same smugglers.  Agent Snyder learned from these two independent informants that the smuggled family members had stated to them that the captive aliens had been beaten, raped and threatened with mutilation (*e.g.*, cutting off of fingers) during their travels from Brazil. Agent Snyder testified that the smuggling organization appeared to be particularly sophisticated.

On January 31, 2008, Agent Snyder received separate telephone calls from Delgado and Silva advising that they had been told that their relatives were in Houston, Texas. The smugglers instructed them to send the additional smuggling fees to a Bank of America account in Mission, Texas, under the name of "Delear Garcia." Ms. Silva reported that the smuggler gave her two telephone numbers (832-387-9109 and 832-266-6520) for making contact with her sister.  Ms. Silva stated that she called 832-387-9109 and spoke to her sister, thus confirming that the phone number she

called was associated with the smuggling operation.  Ms. Silva stated that the smuggler informed her that her sister was then at the location she had called but would be transferred later to a different undisclosed location corresponding to one of the phone numbers and that the new location would be at "Jalber's" house.

On the same evening, Ms. Delgado also received a call from the smuggler telling her the same thing told to Ms. Silva.  The smuggler gave Ms. Delgado phone number 832-387-9109 and told her that her relative would be held until she paid $10,000.  Ms. Delgado called the number provided and was permitted to speak to her relative directly.

On February 1, 2008, Agent Snyder, having determined that these phone numbers were cell phones being used locally, obtained a federal court order signed at about 12:30 p.m. The order directed cell phone companies to provide cell site information for the cell phone numbers that were used by the smugglers.  At approximately 1 p.m., Agent Snyder received information that one of the pertinent telephones was located at 10818 Sela Lane, Houston, Texas 77072 and the other was at 2828 Hayes Street, Houston, Texas, 77082.  ICE Agents began to gather near these locations, and several conducted surveillance starting around 1 p.m.

When Agent Snyder arrived, she and others explained the situation to the approximately twelve agents.  The agents were directed to go to the two locations,

which were suspected to be "stash" houses where the hostages were held.  The goal was to use a "knock-and-talk" procedure to try to obtain consent to search each location.[3]  At approximately 3:00 p.m., a separate team was sent to both the Sela Lane and the Hayes Street locations.

The first team (consisting of six ICE agents) went to the Sela Lane home of Defendant Castaneda.  Agent Terrazas, who speaks Spanish fluently, led this team. He and Agent Kaufmann conducted a "knock-and-talk" by knocking loudly on the front door and announcing that they were "police."   The agents – those who approached the door as well as those who remained farther away from the house – were wearing vests or jackets that were prominently labeled "police" or the like. Because the agents had been informed that hostages were being held and that some had been threatened and beaten, the agents were on alert to potential danger.  As Agent Terrazas knocked and stated they were the police, he and Agent Kaufmann heard movement inside the premises.  Castaneda, the owner of the residence, called to the agents through the door that he was "putting his pants on" or he was "getting dressed."  Castaneda opened the door after approximately two minutes, which seemed a long time in the officers' experience.  Agent Terrazas asked Castaneda to come

---

[3]     Agent Terrazas intended and hoped, as noted above, to obtain consent to search the house.  If consent was denied, he intended to seek a search warrant.

outside and talk, and Castaneda complied, leaving the front door open.  Castaneda and

Agent Terrazas stood on the stoop, to the left of the front door, conversing in Spanish.

Agent Kaufmann stood to the right of Agent Terrazas and Castaneda, where he could

see into the house.  For the protection of the agents and others, Agent Kaufmann

monitored the interior hallway leading to the front door.  Agent Kaufmann was alert

because, in his experience with immigrant smuggling cases and stash houses, guns are

present 90% of the time.  Agent Kaufmann accordingly had his gun drawn but not

visible.

Castaneda denied the agents' request for consent to enter or search the house.

He asked if the agents had an order, and Agent Terrazas responded that they did not.

Meanwhile, during Castaneda's discussion with Agent Terrazas (which Agent

Kaufmann did not understand, as he does not speak Spanish to any meaningful

extent), a man inside the house come into the hallway, looked outside, saw the agents,

and then turned and quickly ran back into the interior of the house.  Agent Kaufmann

believed that the man was likely running to get a gun and was very concerned.[4]  Agent

Kaufmann called to the man to "come to the door" and stated they were police.  The

man continued to run farther into the house.  Agent Kaufmann ran into the house after

---

[4]      As noted, there had been reports by the complainants of violence by the smugglers of
their relatives being held as hostages in this case (including beatings, rapes, and
threats of other harm).

the man and caught him in the kitchen area.  After Agent Kaufmann entered the kitchen, but before he caught the running man, he saw a loaded magazine of rounds on the kitchen table.[5]  The agent subdued the individual he had chased, and determined that he was undocumented.

The agents then searched the premises for further evidence of criminal activity.[6] They found seventeen undocumented aliens – one was Fabiano Delgado and another was the uncle of Ms. Silva's friend.  The two women (Adelaine and Amanda) and the six year old boy reportedly in the group were not present.

Still missing at least three known hostages, Agent Snyder gave the signal to the second ICE team to approach the house at 2828 Hayes Street.  The time was approximately 4:15 p.m.  While the agents suspected there was another stash house with the missing three hostages, the agents were unsure whether that second stash house was at this location.  Led by Agent Klein, the agents conducted another "knock-and-talk."  The officers knocked and loudly announced they were "police."  A male later identified as Defendant Gelber Cornelio Pereira answered the door.  Agents again identified themselves, explained briefly the hostage situation they were investigating, and asked if they could come inside and ask some questions.  Pereira spoke in simple

---

[5]     Later, the agents also found a handgun.

[6]     Defendants have not presented any argument or evidence challenging this search after the arrests were made.

English and responded to the agents' initial questions.  Specifically, Agent Klein asked if there was anyone in the house by the name of "Amanda" or "Adelaine," and Pereira said "no."    Agent Klein requested to enter and Pereira agreed the agents could come "in."  The apartment had a small first floor landing or vestibule; the living space was upstairs.  Pereira, rather than stop to converse with the agents on the landing, started upstairs.  When the agents began to follow him up the stairs, Pereira did not stop the agents from proceeding to the second floor, even though he knew sufficient English to tell the agents to wait downstairs or to stop, had that been his desire.

Agent Klein noted as he entered the first floor that there was mud on the floor, which is typical when smuggled individuals are being moved into a stash house.[7] Upon reaching the second floor, Agent Klein noticed there was no furniture in the home except a TV.  The absence of furniture was a strong indication to Agent Klein that this was a stash house, not a standard residence.

Agent Klein saw two males and a female in the kitchen cooking.  He asked the female if her name was Amanda or Adelaine.  She looked at the two males who whispered something to her and she walked to the back room without answering.

---

[7]      The mud is residue from illegal immigrants crossing the Rio Grande River into the United States.

Suspecting that the occupants were undocumented, Agent Klein asked each one for identification.  All provided passports from Brazil, but none had visas for entry into the United States.  All stated they did not have any documentation allowing them to be in the United States legally.  An agent asked Pereira for identification and learned that he was here illegally.  He (and the others) were placed under arrest.

Thereafter, agents went to the back room of the apartment and found two females and a young boy.  The women confirmed that they were Amanda and Adeline.  Amanda also confirmed that the boy was her son.  The agents also found another woman hiding in the bathtub.[8]

In connection with Pereira's arrest, the agents searched him, found a cell phone in his pocket, and placed it on a nearby counter.  Agent Snyder later came into the room and, without giving Pereira his *Miranda* warnings,[9] asked him if the phone was his.  Pereira admitted that it was.  Agents thereafter checked the phone settings and learned the phone's number was 832-266-6520, one of the numbers given to Agent Snyder on January 31, 2008, by the victims' relatives.  Agents were able to scroll the calls placed on the phone and discovered calls to phone numbers assigned to Ms. Silva, Ms. Delgado and Luis.

---

[8]   According to the Government's Memorandum of Law, the woman (Edna M. Amaral) had been in the United States illegally for 18 years.

[9]   *Miranda v. Arizona*, 384 U.S. 436 (1966).

## II.    **CONCLUSIONS OF LAW**

"Warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007).  The burden is on the United States to establish circumstances justifying a warrantless search.  *Id.*

"The Supreme Court has held that the need to assist persons who are seriously injured or threatened with such injury is an exigency that obviates the need for a warrant." *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008) (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)); *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007); *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001).  "Exigent circumstances generally exist where there is a risk that the officers or innocent bystanders will be endangered, or that evidence will be destroyed." *United States v. Blount*, 123 F.3d 831, 837, 839 (5th Cir. 1997) (*en banc*).  Indeed, "when exigent circumstances demand an immediate response, particularly where there is danger to human life, protection of the public becomes paramount and can justify a limited, warrantless intrusion into the home." *United States v. Holloway,* 290 F.3d 1331, 1334 (11th Cir. 2002).  A court should "not second-guess the judgment of

experienced law enforcement officers concerning the risks of a particular situation."
*Blount*, 123 F.3d at 838.

The Fifth Circuit has identified five factors for consideration in deciding if exigent circumstances are present. *See Jones*, 239 F.3d at 720. Those *Jones* factors, adapted here to a hostage situation, are:

1. The degree of urgency involved and the amount of time necessary to obtain a warrant;

2. The reasonable belief that hostages are about to be moved;

3. The possibility of danger to the police officers guarding the site of hostages while a search warrant is sought;

4. Information indicating that the possessors of the hostages are aware that the police are on their trail; and

5. The ease of disposing of the hostages and the knowledge that efforts to dispose of them and to escape are characteristic behavior of persons engaged in the illegal alien hostage-taking.

*See id.*

Exigent circumstances will not justify a warrantless search if they are the likely consequences of the Government's own actions or inactions. *Gomez-Moreno*, 479 F.3d at 355 (citing *United States v. Vega*, 221 F.3d 789, 795 (5th Cir. 2000)). In

determining whether the officers created the exigency, the court must assess the "reasonableness of the officers' investigative tactics leading up to the warrantless entry." *Id.* (citing *Jones*, 239 F.3d at 720 (quoting *Blount*, 123 F.3d at 838)).   A generally reasonable investigative tactic is a "knock-and-talk" process during which officers seek to gain an occupant's consent to search or where officers reasonably suspect criminal activity.  Unless the officers who approach a house are *convinced* that criminal activity was taking place and that the occupants are armed, then "knock-and-talk" is a reasonable investigative procedure.  *Id.* (citing *Jones*, 239 F.3d at 721).

## A.    10818 Sela Lane

The Court first analyzes the events at 10818 Sela Lane, Castaneda's residence, to determine if there was a Fourth Amendment violation.  The Government contends that exigent circumstances arose when Agent Kaufmann (serving as the "look-out" officer during Agent Terrazas's discussions with Castaneda) observed a man who, when he realized that the police were at the house, ran deeper inside, refusing Kaufmann's commands to come back to him.  Defendants argue that any exigencies were created by the agents themselves and, therefore, do not justify the warrantless entry into the house.[10]  Reviewing the evidence in the context of the *Jones* five-factor

---

[10]    Defendants' reliance on *United States v. Gomez-Moreno*, 479 F.3d 350 (5th Cir. 2007) and *United States v. Troop*, 514 F.3d 405 (5th Cir. 2008) is misplaced because (continued...)

test and the *Vega*/*Gomez-Moreno* line of cases, the Court holds that the warrantless entry into Castaneda's home was justified by exigent circumstances not of the Government's own making and, therefore, the entry did not violate the Fourth Amendment.

As Defendants correctly note, exigencies permitting a warrantless search "may not consist of the likely consequences of the government's own actions or inaction." *United States v. Vega*, 221 F.3d 789, 799 (5th Cir. 2000). If the agents' "knock-and-talk" procedure in this case was reasonable and properly conducted, however, then any resulting exigencies were not created by the government. *See, e.g., United States*

---

[10]    (...continued)
those cases are factually distinguishable from the case at bar. In *Gomez-Moreno*, the agents were conducting surveillance of a house using approximately a dozen agents and a helicopter. When the agents attempted to conduct a "knock-and-talk," unlike in the case at bar, nobody answered the knock. The Fifth Circuit held that the "knock-and-talk" strategy was not properly conducted because, when no one came to the door, the strategy should have been abandoned and any resulting exigencies were created by the agents when they continued to check the door knob and demand entry. *Gomez-Moreno*, 479 F.3d at 355-56.

In *Troop*, as in *Gomez-Moreno* but unlike the case now before the Court, the agents knocked on the door, but no one inside the house responded. The agents then knocked on a different door and demanded that the inhabitants "open up." Still no one responded, so the agents walked around the house, reached through an open window and grabbed a man inside the house. They then entered the house through the window. Unlike the case at bar, in *Troop* there was no properly executed "knock-and-talk" and no subsequent exigency created by an inhabitant of the house who, realizing that there were agents at the house, ran away from the agents and deeper into the house.

*v. Jones*, 239 F.3d 716, 722 (5th Cir. 2001).[11]  In this case, the Court has found that the "knock-and-talk" strategy was reasonable.  The agents had information from which they believed that one of the cell phones associated with the smuggling operation was in the Sela Lane house, and they reasonably suspected that there were hostages in the Sela Lane residence.  They did not know, however, if the hostages were still at the residence and so they needed to investigate further.  The decision to engage the occupants in the residence in a voluntary conversation was an appropriate, available procedure.  The Court also finds that the "knock-and-talk" was properly conducted.  Two ICE agents approached the front of the house and knocked on the front door.[12]  No demands to "open up" were made by the agents.  *Cf. United States*

---

[11]    The Court finds the *Jones* case to be factually similar to the case at bar and controlling.  In *Jones*, as here, the agents conducted a "knock-and-talk" as part of a criminal investigation.  In both cases, the agents had not observed any criminal activity at the residence before they approached.  In both cases, a small number of agents (two in this case and three in *Jones*) approached the door while the other agents waited elsewhere.  In both cases, one officer knocked on the door, announced his presence, and waited for a response.  In both cases, the inhabitant of the house answered the knock, unlocked the door, and began talking to the officers while standing outside the house.  In *Jones*, one of the officers looked through the screen door and observed a handgun on the kitchen table.  In the case at bar, one of the officers looked through the open door and observed a man note the agents' presence and then run back into the interior of the house.  In both cases, the agents entered the residence without a warrant.  And in both cases, the agents' concern for the immediate safety of the agents and others excused the warrantless entry into the residence.

[12]    The location of the remaining agents is unclear from the record, but there is no indication they were near the front door or constituted a show of force, as was criticized in *Gomez-Moreno*.

*v. Troop*, 514 F.3d 405, 408 (5th Cir. 2008); *United States v. Gomez-Moreno*, 479

F.3d 350, 355-56 (5th Cir. 2007).  After a brief delay, Castaneda came to the door and

spoke with Agent Terrazas.  The "knock-and-talk" was properly used to request

information and to seek consent to enter and search the house.  *See Jones*, 239 F.3d

at 721-22.  Consequently, any exigencies in this case were not created by the agents,

but were created by the male who, when he realized there were law enforcement

officials at the house, decided to run back into the house and refuse an officer's order

to come forward.

The Court next applies the *Jones* factors to determine whether there were

exigent circumstances justifying the agents' warrantless entry into the house on Sela

Lane.  The first two *Jones* factors support the agents' entry.  There was urgency

involved.  The smugglers were part of a sophisticated and extensive smuggling

organization.  After almost a month of reports, the agents finally had hard information

on the hostages' possible location, but had been told by a hostage's relative that the

hostages had been told they would be moved again.  If the hostages were moved, the

agents had no means to predict with any certainty where they would be taken.[13]

Moreover, it would likely have taken several hours for agents to obtain a search

---

[13]    To perform undetected moving surveillance is exceedingly difficult, particularly near
rush hour.

warrant,[14] and it was not clear whether their request for one would have been granted.[15]

The third *Jones* factor also supports the existence of exigent circumstances. Once the occupant in the house ran from Agent Kaufmann and refused to follow his order to come back, the agent had a reasonable apprehension of danger to himself or any hostages inside the residence.

With reference to the fourth *Jones* factor, the agents correctly concluded, once the man ran back into the house, that not only Castaneda but the other occupants in the house who had control of the hostages were aware that the police were there. Thus, this factor supports the conclusion that Agent Kaufmann's entry into Castaneda's home was reasonable under the specific circumstances presented in this somewhat unique case.

---

[14]    Sela Lane is just off Wilcrest Drive, which is west of the West Sam Houston Tollway. See http://maps.google.com/maps?hl=en&tab=wl.  The address given to the agents as the location of the second phone, 2828 Hayes Rd., Houston, TX  77082, was nearby. *See* http://maps.google.com/maps?hl=en&tab=wl.

At a minimum, to get a warrant would have involved drafting a more detailed affidavit and application, getting a hearing with a designated judge who often is busy during the work day, getting the warrant/order filed, and then traveling back out to the house to serve the order. Travel between downtown Houston and Sela Lane involves a 16.7 mile trip and takes at least 25 minutes, assuming (optimistically) no traffic.

[15]    The Government does not argue that it had probable cause sufficient for a warrant prior to entry into Castaneda's home.

The last *Jones* factor, whether the hostages could be readily disposed of and whether it is typical in circumstances similar to those here, also supports the existence of exigent circumstances in this case.  The agents knew, both generally in connection with alien hostage investigations and specifically for this case, that the hostages can be readily moved among different locations.  Additionally, in this case, the agents knew that the smugglers had told Ms. Delgado that they would kill one of the hostages (De Silva) if the demanded money was not paid.  It was reasonable to believe that the smugglers were equally willing to kill their hostages to escape if necessary.  The Court finds in this case that Agent Kaufmann had a reasonable apprehension that the hostages could be harmed.

The Court accordingly holds that consideration of the *Jones* factors establishes that there were exigent circumstances presented in this unusual situation.  Indeed, there were exigent circumstances in terms of safety risks both to the agents and to any hostages inside the house.  Such safety risks "are exigent circumstances that may excuse an otherwise unconstitutional intrusion into a residence."  *Jones*, 239 F.3d at 720.

There were exigent circumstances that justified the ICE agents' warrantless entry into the Sela Lane residence, and those exigencies were not the likely consequence of the agents' "knock-and-talk" procedure.   Once inside, Agent

Kaufmann caught the man who had run back inside the house and determined that the man was an undocumented alien subject to arrest on that basis. The agents at that point were entitled to conduct a search incident to the arrest. *See, e.g., United States v. Mata*, 517 F.3d 279, 285 (5th Cir. 2008). During this limited search, the agents discovered a firearm and seventeen hostages. The Government has met its burden as to the justification for the agents' entry into the Sela Lane residence.

### B.   2828 Hayes Street

The Court next turns to the issue of whether the entry of Agent Klein and others into the Hayes Street residence violated the Fourth Amendment by entering the second floor of Pereira's residence.[16] The Court concludes that no violation occurred and that the agents reasonably understood that Pereira had consented to their entry into the second floor of the apartment. Subsequent observations and information obtained by Agent Klein thereafter justified the further search of the premises in connection with the lawful arrests. During that search, agents found the remaining hostages.

The parties in their briefing addressed primarily whether there were exigent circumstances when Agent Klein entered the apartment where Pereira was staying.

---

[16]   The Court will address in the next section of this Memorandum the separate issue of whether the agents violated Pereira's rights by asking him about the cell phone in his pocket.

The dispositive issue, however, is whether Pereira gave voluntary consent for the agents to enter the apartment.

The Fifth Circuit considers six factors in evaluating the voluntariness of consent to search, all of which are relevant, but no one of which is dispositive or controlling." *United States v. Solis,* 299 F.3d 420, 436 (5th Cir.2002).  The six factors this court considers are: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found."  *Id.* at 436 n.21 (citation and internal quotation marks omitted).  Consideration of these factors leads to the conclusion that Pereira voluntarily consented to Agent Klein and the other agents entering the second floor of Pereira's apartment.

First, Defendant Pereira was not in custody when he agreed that Agent Klein and the others could enter.  The testimony of Agent Klein is uncontradicted and is credited.  Agent Klein stated that he explained to Pereira in English the purpose of the visit and requested to discuss matters further inside the home.  Pereira, who spoke some English, agreed that Agent Klein could enter.  Pereira was not in custody and voluntarily spoke with the agents.  There were no coercive police procedures

employed prior to the request to enter or Pereira's giving consent. Defendant Pereira appeared by his actions to cooperate with the police.  There is no evidence regarding Defendant's awareness of his right to refuse consent, his education and intelligence, or what Pereira believed regarding whether the agents would find incriminating evidence. Under all the circumstances, the Court finds that Pereira consented to the agents entering the premises.

Defendant argues, without supporting evidence, that Pereira did not consent to the agents entering the second floor of the residence, and that he consented only to the agents entering a small entry area at the bottom of the stairs while he found someone upstairs who spoke English.  The Court is entirely unpersuaded.  First, Pereira spoke adequate English to respond to Agent Klein's questions.  Had Pereira intended that the agents stay downstairs, he was capable of holding up his hand and indicating or expressly saying to the agents "stop" or "wait."  He did not do so.  Further, there is no evidence that there was anyone in the apartment who spoke English better than Pereira.[17]  The Court is convinced that Pereira voluntarily consented to the agents' entry into his residence.

---

[17]    It is noted that during the suppression hearing Pereira audibly spoke several sentences in English to his attorney.  While counsel argues that he could not understand his client's English, the Court finds that Pereira could have successfully communicated to Agent Klein that he (Pereira) wanted the agents to wait at the bottom of the stairway.

Because the agents had consent to enter the second floor of the residence at 2828 Hayes Street, the Court need not address whether there were exigent circumstances justifying the entry.  Consequently, the Court next considers if the agents' further investigation in the apartment violated the Fourth Amendment.  Agent Klein properly asked Pereira and others for identification.  As part of the consensual encounter, the agent was permitted to make inquiry of the two men and the woman in the kitchen.  In response to Agent Klein's inquiry whether the woman was one of the female hostages he was looking for (Amanda or Adelaine), these individuals' behavior (the man whispering to the woman who then left the room) was suspicious.  Further, each of the individuals held Brazilian passports without visas for entry in the United States, thus demonstrating that each was here illegally.  Agent Klein was permitted to arrest them on that basis.  Thereafter, the agents were permitted to conduct a protective sweep in aid of officer safety.  *See, e.g., United States v. Mata*, 517 F.3d 279, 285 (5th Cir. 2008).  During that cursory search, agents located the two female hostages and the missing boy in a back room.  There is no basis to suppress the evidence of the hostages' location in the Hayes Street apartment.

## C.    **Admissibility of Pereira's Statement that the Cell Phone Was His**

The Court last addresses Defendant Pereira's contention that Agent Snyder's question to him concerning his ownership of the cell phone found in his pocket

violated his rights because, although he was in custody at the time, he had not been given his *Miranda* warnings.  The Court agrees.  Once Pereira was in custody, the agents had no right to question him about the cell phone's ownership, or otherwise, until he had been given *Miranda* warnings and he had agreed to talk to them.  It is undisputed that these warnings had not been given before Agent Snyder asked him about his cell phone.  The Court accordingly suppresses evidence that Pereira admitted to Agent Snyder that the cell phone found in his pocket belonged to him.[18]

## III.   CONCLUSION AND ORDER

Based on the foregoing, the Court concludes that the warrantless entry into the Sela Lane residence was justified by exigent circumstances and that the warrantless entry into the Hayes Street residence was pursuant to valid, voluntarily-given consent. The Court further concludes that the subsequent searches of both residences were justified as incident to lawful arrests.  Accordingly, it is hereby

**ORDERED** that Defendants' Motions to Suppress [Docs. # 38 and # 56] are **GRANTED** to the sole extent that Pereira's statement to Agent Snyder that the cell phone found in his pocket belonged to him is suppressed and **DENIED** in all other respects.  It is further

---

[18]   This ruling does not address the admissibility of any statements regarding the ownership or control of the cell phone made by Pereira before his arrest or of any other evidence that the cell phone belonged to Pereira.

**ORDERED** that the Court will conduct a a pretrial and scheduling conference

on **Monday, June 2, 2008, at 10:00 a.m.**

SIGNED at Houston, Texas, this 14th day of **May, 2008.**

Nancy F. Atlas
United States District Judge